UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| BOSTON AND MAINE CORPORATION, | * | |
| | * | Civil Action No. 13-10087-IT |
| Defendant, | * | |
| | * | |
| v. | * | |
| | * | |
| TOWN OF AYER, MASSACHUSETTS, | * | |
| | * | |
| Third-Party Defendant. | * | |

ORDER

September 22, 2016

TALWANI, D.J.

Plaintiff United States of America ("United States") seeks to recover costs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C § 9607(a), from Defendant Boston and Maine Corporation ("B&M") for the cleanup of a six-acre plot of land and an adjacent pond at the Fort Devens Superfund site. Compl. ¶¶ 2, 8 [#1]. Now before the court are the United States' Motion for Partial Summary Judgment on Boston and Maine Corporation's Statute of Limitations Defenses [#80] and B&M's Motion for Summary Judgment [#82]. Finding that the statute of limitations did not begin to run until September 2015, the court ALLOWS the United States' motion for partial summary judgment and DENIES B&M's motion for summary judgment.

I.     <u>Factual Background</u>

In 1991, the Environmental Protection Agency ("EPA") and the United States Army

("Army") entered into a Federal Facility Agreement governing the CERCLA cleanup of

hazardous materials at the 9,000-acre Fort Devens Superfund Site ("Fort Devens"). Def.'s Mot.

Summ J. Ex. 5 at 6, 10, 12, 24 (Federal Facility Agreement) [#83-5]. The agreement names the

Army as the agency primarily responsible for the cleanup. <u>Id.</u> at 29.

In 1993, Army contractors at Fort Devens began investigating possible contamination in

a six-acre plot of land (the "Roundhouse Site") where the Boston & Maine Rail Road (the

predecessor of B&M) had owned and operated a railroad roundhouse from approximately 1900

to 1935. Pl.'s Mot. Summ. J. Ex. 2 at 8, 11, 13 (Final SA 71 Sediment Risk Characterization,

May 2008) [#81-2]; Def.'s Mot. Summ. J. Ex. 11 at 15 (Draft Railroad Roundhouse Site

Investigation Report) [#83-11]; Ex. 14 at 10 (Railroad Roundhouse Supplemental Site

Investigation Work Plan) [#83-14].[1] Because the Roundhouse Site had not previously been

targeted for investigation as an Area of Contamination or Study Area, the soil and sediment

samples taken at or near the site were "only to assess the presence or absence of contamination"

and were used as "a basis for deciding if more extensive sampling is warranted." Def.'s Mot.

Summ. J. Ex. 11 at 8, 15 [#83-11]. A draft report analyzing those soil samples was issued in

September 1993 and noted the presences of several "Chemicals of Potential Concern"—

including antimony, copper, and lead—at the Roundhouse Site. <u>Id.</u> at 2, 15, 36. The draft report

was inconclusive as to the source of these chemicals, noting that "[t]he high observed

concentrations were associated with ash deposits along the edge of Plow Shop Pond" but

"exceed[ed] those considered typical of coal ash" and that "[a] second possibility is work or

---

[1] In 1942, B&M's predecessor sold a fifty-three acre plot of land including the six-acre
Roundhouse Site to the Army. <u>See</u> Def.'s Mot. Summ. J. Ex. 22 at 2-3, 6 (Completion Report –
Transfer of Real Estate) [#83-22].

waste disposal practices at the former roundhouse." Id. at 19, 21. The report noted that, "[b]ased

on available data, it should not be concluded that the roundhouse area is or was the source of

copper and lead contamination in Plow Shop Pond sediments." Id. at 21.

Army contractors at Fort Devens also began investigating Plow Shop Pond, which lies

adjacent to the Roundhouse Site, another pond ("Grove Pond") and a landfill ("Shepley's Hill

Landfill"). Def.'s Mot. Summ. J. Ex. 20 at 26 (Remedial Investigation Addendum Report) [#83-

20].[2] In December 1993, the Army issued a report indicating that a study by the contractors

found "widespread elevated concentrations of several inorganics in Plow Shop Pond sediments

including arsenic, barium chromium, copper, iron, lead, manganese, mercury, nickel, and zinc."

Id. at 2, 26. The report noted that Shepley's Hill Landfill and Grove Pond were interpreted to be

the "major" sources or contributors of these contaminants. Id. This report made no mention of

any contamination of Plow Shop Pond from the Roundhouse Site.

In October 1994, a Supplemental Site Investigation Work Plan ("October 1994 Work

Plan") was prepared for the Roundhouse Site, proposing: (1) additional sediment sampling "to

confirm analytical data from the March 1993 sampling and to provide information on the

distribution of inorganic analytes"; (2) additional soil sampling "to assess the presence and

vertical distribution of [volatile inorganic compounds] and inorganics in [the] soil"; (3) the

installation of monitoring wells to "characterize groundwater quality downgradient of the

railroad roundhouse"; and (4) the collection and analysis of groundwater samples "to assess

whether the roundhouse site is a current source of groundwater contamination." Def.'s Mot.

Summ. J. Ex. 14 at 3, 19-21 [#83-14]. Roundhouses of that era were used to perform

maintenance and repair on locomotives, which involved the use of substances including copper

---

[2] Plow Shop Pond, Grove Pond, and Shepley's Hill Landfill are all outside of the fifty-three acre
plot of land sold by B&M's predecessor to the Army. Def.'s Mot. Summ. J. Ex. 22 at 2 [#83-22];
Simeone Decl. Supp. Pl.'s Mot. Summ. J. Ex. 1A at 7 [#81-1].

and antimony and the disposal of ash into ash pits. Pl.'s Mot. Summ. J. Ex. 2 at 12 [#81-2]; id. at

1-3. Disagreeing with the September 1993 soil and sediment analyses, the October 1994 Work

Plan stated that "a [more] probable source" of the elevated concentrations of antimony, copper,

and lead found in those analyses was the "maintenance activities at the former roundhouse"

rather than coal ash observed at the sample locations. Def.'s Mot. Summ. J. Ex. 14 at 11 [#83-

14].

 In late 1994, the Army began the supplemental sampling recommended by the October

1994 Work Plan and reported on its findings in September 1995 in the Railroad Roundhouse

Supplemental Site Investigation ("Roundhouse Supplemental Site Investigation"). Def.'s Mot.

Summ. J. Ex. 12 at 2, 12 (Roundhouse Supplemental Site Investigation) [#83-12]. The data

gathered during the supplemental sampling confirmed "high concentrations of antimony, copper

and lead . . . suggest[ing] that the area was used for disposal of maintenance by-products from

activities at the former roundhouse" and that contaminants found at the Roundhouse Site "appear

to extend approximately 15 to 25 feet out into Plow Shop Pond." Id. at 13. The Roundhouse

Supplemental Site Investigation recommended that "remediation" of soils at an area on the

Roundhouse Site where locomotive maintenance by-products were disposed (the "Maintenance

By-Product Area") "may be appropriate" and that "remediation/removal of soils in the

maintenance by-product area be further evaluated." Id. The report further noted that the "Plow

Shop Pond sediments immediately adjacent to the [Maintenance By-Product Area] share[d]

similar characteristics with those [in the Maintenance By-Product Area] and [that]

remediation/removal of [those] sediments may be appropriate at the same time." Id. at 14.

 On October 31, 1995, as a result of these and other investigations, the EPA concurred

with the Army's nomination of a number of new Areas of Concern and Study Areas, including

Plow Shop and Grove Ponds as a new Area of Concern (AOC 72) and the Roundhouse Site as a new Study Area (SA 71). Pl.'s Mot. Summ. J. Ex. 7 at 2 (EPA Letter October 31, 1995) [#81-7].

In 1996, a draft action memorandum to address contaminants at the Roundhouse Site was prepared. See Def.'s Mot. Summ. J. Ex. 18 at 5, 8 (Draft Action Memorandum) [#83-18]. The draft "document[ed] the decision to perform a time-critical removal action" for the Roundhouse Site and specifically recommended excavation of 2,600 cubic yards of soil from the Maintenance By-Product Area. Id. at 8.

In November 1999, the Army issued a finalized Action Memorandum ("1999 Action Memorandum") which recommended excavation and off-site disposal of only 650 cubic yards of soil at the Maintenance By-Product Area. Def.'s Mot. Summ. J. Ex. 27 at 2, 12 (1999 Action Memorandum) [#83-27]. The 1999 Action Memorandum specifically proposed excavating soils that contained concentrations of Chemicals of Potential Concern ("COPC") that exceeded the project's "preliminary remediation goals." Id. at 5, 7, 12. Those goals were based on analyses of anthropogenic background concentrations of the COPCs (i.e., concentrations of COPCs due to non-site specific human activity) and were established in order to be "protective of human health, welfare, and/or the environment." Id. at 12. Because no COPCs were identified in the groundwater samples taken pursuant to the October 1994 Work Plan, the 1999 Action Memorandum proposed excavation of soil primarily above the water table except for certain "hot spots" below the water table. Id. The 1999 Action Memorandum further recommended restoration of the excavated soils with clean fill, topsoil, and seed in order to prevent erosion. Id. at 14. Finally, the 1999 Action Memorandum stated that the proposed excavation, disposal, and restoration was "expected to provide a long-term solution for soil at the site" and would

"mitigate the potential threat to human health, welfare, and/or the environment identified at the Maintenance By-Product Area." Id. at 12.

The work at the Roundhouse Site recommended by the 1999 Action Memorandum began in November 1999, the same month the Action Memorandum was issued. Def.'s Mot. Summ. J. Ex. 21 at 21 (January 2001 Study Area 71 Final Closure) [#83-21]. After initial excavation of the 650 cubic yards proposed by the 1999 Action Memorandum, further sampling revealed significant amounts of metals contamination beyond the excavated area. Id. at 23. Also after the first round of excavation, the preliminary remediation goals set by the 1999 Action Memorandum were determined by the Army to be too conservative and were re-evaluated and adjusted. Id. at 20. As a result of the discovery of additional contamination and the adjustment of the preliminary remediation goals, two additional rounds of excavation were undertaken, extending the excavated area both laterally and deeper into the water table. Id. at 23-24. Ultimately, the Army excavated 2,400 cubic yards of soil from the Roundhouse Site including approximately 494 tons of lead-contaminated soil. Id. at 28, 33. After the excavated area was backfilled and compacted, the area was covered with loam and seed in May 2000. Id. at 29.

In January 2001, the Army contractor submitted its Final Closure Report ("2001 Final Closure Report") to the Army, concluding that the excavation, disposal, and restoration at the Roundhouse Site had "resulted in a significant reduction of the potential threat to human health and welfare of the environment." Id. at 2, 33. The Report noted that, although residual contamination remained in concentrations exceeding the preliminary remediation goals set by the 1999 Action Memorandum, "more reasonable" goals had been set during the course of the work. Id. at 33. The Report recommended that further evaluation of the site, including analysis of the

residual contamination, "would likely be needed before the site can be closed out" but did anticipate that the further risk evaluations would support a "No Further Action Decision." Id.

In January 2002, the Army contractor prepared a draft "No Further Action" report ("2002 Draft Report") stating that the risk evaluation recommended by the 2001 Final Closure Report for the Roundhouse Site "indicated that further excavation was not necessary to protect human health and the environment, and was used to support a no further action decision." Def.'s Mot. Summ. J. Ex. 19 at 3, 11 [#83-19]. The 2002 Draft Report concluded that, although soil at the Roundhouse Site, SA 71, no longer posed a significant risk to human health and the environment, the preliminary risk evaluation for that site "suggested that potential risk[s] to sensitive ecological receptors might occur in Plow Shop Pond near-shore sediments at the railroad roundhouse" and that possible sediment contamination in near-shore sediments in Plow Shop Pond would be addressed under a different study area, SA 72. Id. at 12. Because any action necessary to address contaminated sediments in Plow Shop Pond would be considered in SA 72, the report recommended that "[n]o further response action is required at SA 71." Id.

In July 2003, the EPA provided comments to the 2002 Draft Report, stating that the EPA was "unable to concur" with the report's recommendation "until the arguments put forth in favor of the no-action decision are expanded and revised." Pl.'s Mot. Summ. J. Ex. 13 at 2 (July 2013 EPA Letter) [#81-13]. Specifically, the EPA objected to the use of the Massachusetts Contingency Plan, rather than the National Contingency Plan ("NCP"), 40 C.F.R. 300 et seq., the EPA's regulations implementing CERCLA, to set the adjusted preliminary remediation goals for the Roundhouse Site and to conduct the risk assessments there. See id. at 2. In addition, the EPA noted that the excavations had failed to reach the preliminary remedial goals set by the 1999 Action Memorandum, despite the fact that the quantity of soil removed was nearly four times

that recommended by the memorandum. Id. Finally, the EPA took issue with the Army's decision to base its risk evaluation on upland soils only and its further decision not to "administratively transfer" the evaluation and possible remediation of offshore sediments to the study being administered for SA 72. Id. at 3. Because the 2002 Draft Report's recommendation of no further action was based on analysis of upland soils only (*i.e.*, those away from Plow Shop Pond) and because the contaminated soils were known to extend into Plow Shop Pond by fifteen to twenty-five feet, "the EPA recommend[ed] that the Army expand upon the preliminary risk evaluation prepared as a part of the [1995 Supplemental Site Investigation] to more thoroughly consider potential risks to sensitive ecological receptors in Plow Shop Pond from exposure to near-shore sediments." Id. The Army drafted, but did not issue, a response to the EPA's comments to the 2002 Draft Report. Def.'s Mot. Summ. J. Ex. 30 (Response to Comments on No Further Action Decision Document) [#83-30]; Simeone Dep. in Defs.' Mot. Summ. J. Ex. 13 at 23 [#81-13].

After the Army prepared and the EPA commented on the 2002 Draft Report, the EPA and Army began setting cleanup goals and acceptable risk levels for Plow Shop Pond. First, the EPA completed its Expanded Site Investigation of Plow Shop Pond in May 2006. See Pl.'s Mot. Summ. J. Ex. 15 (Expanded Site Investigation Final Report) [#81-15]. Next, the Army completed a risk analysis of sediment in Plow Shop Pond in May 2008. See Pl.'s Mot. Summ. J. Ex. 2 [#81-2]. The Army's analysis confirmed antimony, copper, lead, and zinc contaminants in Plow Shop Pond near-shore sediments and concluded that the contamination was "interpreted to have been contributed at least in part by former railroad roundhouse activities." Id. at 8. The report noted, however, that some of the chemicals identified in Plow Shop Pond substrate near the SA 71 shoreline likely originated from sources other than the roundhouse. Id. at 9.

In 2009, the Army created a work plan for conducting a Remedial Investigation of Plow Shop Pond and completed the Remedial Investigation itself in March 2011. Pl.'s Mot. Summ. J. Ex. 16 at 12 (Remedial Investigation Report for AOC 72, Plow Shop Pond) [#81-16]. The Remedial Investigation "present[ed] the nature, extent, and associated risks to human health and the environment from contamination at Plow Shop Pond" and concluded that "potential adverse effects on human health from arsenic and other contaminants in AOC 72 [Plow Shop Pond] are within USEPA's acceptable risk levels for quantitative risks." Id. at 12. The Remedial Investigation further noted that "Study Area (SA) 71 (*i.e.*, the former railroad roundhouse area) at the south end of AOC 72 does not appear to be a significant source of contaminants that drive human or ecological risks, though it does appear to have elevated levels of lead, zinc, and polycyclic aromatic hydrocarbons in sediment." Id. at 13.

Shortly thereafter, in April 2011, the Army began preparing an Engineering Evaluation/Cost Analysis to evaluate alternatives for addressing two areas of contamination in Plow Shop Pond—one area adjacent to the Roundhouse Site and one area (known as Red Cove) adjacent to Shepley's Hill Landfill. Pl.'s Mot. Summ. J. Ex. 17 at 2, 7 (April 2011 AOC 72 Engineering Evaluation/Cost Analysis Approval Memorandum) [#81-17]. The Army issued a Draft Final Engineering Evaluation/Cost Analysis in December 2011, see Pl.'s Mot. Summ. J. Ex. 19 at 2 (January 2012 EPA Letter) [#81-19], followed by a June 2012 Action Memorandum ("2012 Action Memorandum") adopting the recommendations of the Engineering Evaluation/Cost Analysis, see Pl.'s Mot. Summ. J. Ex. 20 at 9 (2012 Action Memorandum) [#81-20]. The 2012 Action Memorandum determined that "Non-Time-Critical" removal action was appropriate "to remove, control or contain the risk from the potential exposure to the release of hazardous substances from sediment in Red Cove or the shoreline along [the Roundhouse Site]."

Pl.'s Mot. Summ. J. Ex. 20 at 15 [#81-20]; see also id. at 8. The work proposed by the 2012

Action Memorandum for the portion of Plow Shop Pond adjacent to the Roundhouse Site

included the excavation and disposal of all visible "maintenance by-product deposits" that

extended as an apron of material into the pond by about ten to forty feet. Id. at 20. The 2012

Action Memorandum further stated that, "[i]f the proposed removal action . . . is delayed or not

implemented, arsenic and maintenance byproduct-impacted sediment may continue to pose a risk

to human health and/or the environment." Id. at 21.

Work proposed by the 2012 Action Memorandum, including the removal of sediment

adjacent to the Roundhouse Site, occurred in 2013. Pl.'s Mot. Summ. J. Ex. 21 at 9 (Removal

Action Complete Report) [#81-21]; Def.'s Mot. Summ. J. Ex. 28 at 8 (Pl.'s Objs. and Answers to

Def.'s First Set Interrogs.) [#83-28].

In January 2013, while work recommended by the 2012 Action Memorandum was

ongoing, the Army filed the complaint in this action. See Compl. [#1].

In December 2014, after analyses for Plow Shop Pond were completed, the Army issued

an updated Risk Characterization of the Roundhouse Site. See Pl.'s Mot. Summ. J. Ex. 14 (Study

Area 71 Risk Characterization) [#81-14]. The Risk Characterization determined that land use

controls that, at a minimum, restricted the use of the property against residential development

and occupancy would be appropriate for the Roundhouse Site and that use of the Maintenance

By-Product Area as an "open/recreational space" would not result in significant risk to visitors.

Id. at 5-6.

Shortly thereafter, in January 2015, the Army issued a proposed plan ("Proposed Plan")

for public comment recommending final cleanup decisions for the Roundhouse Site and Plow

Shop Pond. See Pl.'s Mot. Summ. J. Ex. 22 (Proposed Plan) [#81-22]. The Proposed Plan

recommended no further excavation for either the Roundhouse Site or Plow Shop Pond, and deed restrictions running with the land to prevent residential use and to require safe soil handling during construction work at the Roundhouse Site. Id. at 7-10. In September 2015, the Army issued a single Record of Decision for both sites. See Filing R. Decision Ex. 1 [#95-1]. The Record of Decision selected no further action as the preferred remedy for Plow Shop Pond and the implementation of land use controls as the preferred remedy for the Roundhouse Site. Id. at 30.

II.      Discussion

The United States alleges that the response activities taken at the Roundhouse Site and in the portion of the Plow Shop Pond immediately adjacent to the Roundhouse Site are "removal actions," and it seeks to recover the costs it incurred in connection with those activities. Compl. ¶¶ 2, 17 [#1]. B&M contends that the action is time-barred. Answer ¶ 31 [#25]. Both parties move for summary judgment as to this affirmative defense.

A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the material facts are not in dispute, but the parties disagree on the proper construction of several sections of CERCLA.

*1.   Statutory Overview*

Congress passed CERCLA in 1980 "to promote timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 602 (2009) (internal quotation marks and citations omitted). CERCLA authorizes the President to respond to a release or substantial threat of release of a hazardous substance by "act[ing], consistent with the

national contingency plan, to remove or arrange for the removal of, and provide for remedial

action relating to[,] such hazardous substance . . . deem[ed] necessary to protect the public health

or welfare or the environment." 42 U.S.C. § 9604(a)(1).

CERCLA defines "remove" or "removal" as "the cleanup or removal of released

hazardous substances from the environment" including (1) "such actions as may be necessary

taken in the event of the threat of release of hazardous substances into the environment"; (2)

"such actions as may be necessary to monitor, assess, and evaluate the release or threat of release

of hazardous substances"; (3) "the disposal of removed material"; or (4) "the taking of such other

actions as may be necessary to prevent, minimize, or mitigate damage to the public health or

welfare or to the environment, which may otherwise result from a release or threat of release."

42 U.S.C. § 9601(23). The statute further provides that the term "removal"

> [i]ncludes[,] . . . without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title [governing investigations, monitoring, surveys, testing, and related activities] and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C. § 5121 *et seq.*].

Id. CERCLA defines "remedy" and "remedial action" as

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

Id. The statute further provides that

> [t]he term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water

supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

Id.

Both "removal" and "remedial" are given further meaning through the EPA's regulations implementing CERCLA, known as the National Oil and Hazardous Substances Contingency Plan ("National Contingency Plan" or "NCP"), 40 C.F.R. 300 *et seq.* Specifically, the NCP describes "remove or removal" as "refer[ring] to containment and removal of . . . hazardous substances . . . or the taking of such other actions as may be necessary to minimize or mitigate damage to the public health or welfare of the United States . . . or to the environment," and "remedy or remedial action" as "those actions consistent with permanent remedy taken instead of, or in addition to, removal action . . . to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 40 C.F.R. 300.5.

Under CERCLA, a potentially responsible party is strictly liable to reimburse the government for "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A); see also United States v. Bestfoods, 524 U.S. 51, 65 (1998) (under CERCLA, "any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution"); United States v. Gen. Elec. Co., 670 F.3d 377, 382 (1st Cir. 2012) ("CERCLA authorizes the EPA to undertake cleanup activities at designated hazardous sites and then sue to recover costs incurred from certain liable parties.").

In stark contrast to statutes of limitations that are triggered by knowledge of a potential claim, CERCLA ties its limitation period to when cleanup costs actually are incurred. Section § 9613(g)(2) provides that "an action may be commenced under section 9607 of this title for

recovery of costs *at any time after such costs have been incurred*" "[e]xcept as otherwise provided in [that] paragraph." 42 U.S.C. § 9613(g)(2) (emphasis added). Subparagraph (A) of that section provides that an initial action for the recovery of costs for a removal action must be commenced "within 3 years after completion of the removal action." Id. § 9613(g)(2)(A). Subparagraph (B) provides that an initial action for recovery of costs for a remedial action must be commenced "within 6 years after initiation of physical on-site construction of the remedial action," and, "if [that] remedial action was initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action" for the remedial action. Id. § 9613(g)(2)(B). The statute specifically provides, however, that, "[i]f the President selects a remedial action that results in any hazardous substances, pollutants, or contaminants remaining at the site"—in other words, if the hazardous substances are not removed entirely—the President must review the remedial action "no less often than each 5 years after the initiation of such remedial action," and if, upon such review, it is the President's judgment that "action is appropriate," "the President shall take or require such action." Id. § 9621(c). "A subsequent action or actions under section 9607 of this title for further response costs at the . . . facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action." Id. § 9613(g)(2). Thus, the triggering event to recover costs incurred in a remedial action is the "initiation of on-site construction of the remedial action" at the facility, while the triggering event for "removal action" is the "completion" of the action.

### 2. *Scope of the Facility*

B&M contends that there is a single facility at issue here—namely, Fort Devens—and that the statute of limitations for recovering response costs were triggered by the first removal

and remedial activities anywhere at Fort Devens. The court agrees with the United States that Fort Devens does not constitute a single "facility" under CERCLA.

CERCLA defines "facility" as

(A) any building, structure, installation, equipment, pipe, or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located. . . .

42 U.S.C. § 9601(9). Fort Devens is not a single building, structure, pipeline, pond, landfill, or storage container. Nor is it a site "where a hazardous substance has been deposited . . . or . . . come to be located." See id.

In contrast, Plow Shop Pond and the Roundhouse Site fit the definition of a "facility" within the meaning of CERCLA, both singly and jointly: the Roundhouse Site is a "site . . . where a hazardous substance has been deposited [or] disposed of"; the Plow Shop Pond is a "pond"; and the Roundhouse Site and Plow Shop Pond together also are "a site . . . where a hazardous substance has been deposited . . . , disposed of . . . , or otherwise come to be located." See id.

Indeed, though B&M cites 42 U.S.C. § 9601(9), it offers no analysis as to why all of Fort Devens would be a single facility under that definition. B&M relies instead on the Federal Facility Agreement under CERCLA Section 120 ("Federal Facility Agreement") entered into by the Army and the EPA. As is clear from its full title, the Federal Facility Agreement is made pursuant to Section 120 of CERCLA, 42 U.S.C. § 9620, which applies to federal facilities. The First Circuit long has recognized that a federal facility under section 9620 "may contain several potential hazardous waste sites," noting that "[t]he EPA, for example, has identified thirteen potential hazardous waste sites at Hanscom Air Force Base in Massachusetts." Conservation

Law Found. of New England, Inc. v. Reilly, 950 F.2d 38, 39 n.1 (1st Cir. 1991). Notably, while section 9620 places certain obligations for federal facilities on the federal government, it also specifically provides that "[n]othing in this section shall be construed to affect the liability of any person or entity under sections 9606 and 9607 of this title." 42 U.S.C. § 9620(a)(1).

B&M nonetheless argues that the Government "stipulated" in this Federal Facility Agreement that the facility for all CERCLA purposes is the 9000-acre Fort Devens. B&M points to provisions of the Federal Facility Agreement which define "Facility" and "Federal Facility" as the "Fort Devens Army Installation" and define "Site" as

> land owned [or] operated . . . by any department or agency of the United States Government or other owners or operators, in the past, present or at a future time at the Federal Facility known as the Fort Devens Army Installation or any area off the Facility to or under which a release of Hazardous Substances has migrated, or threatens to migrate, from a source on or at Fort Devens Army Installation.

Def.'s Mot. Summ. J. Ex. 5 [hereinafter "FFA"] at 17, 20 [#83-5]. B&M notes that the Federal Facility Agreement states further that "[t]he Site is a Facility within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9)," id. at 28, and that the Army and the EPA agree that Fort Devens is to be listed on the National Priorities List as a single facility and not removed until the EPA determines that the "Site" no longer poses a threat, id. at 13. B&M contends that all of these provisions demonstrate that the United States has treated Fort Devens as a single facility for CERCLA purposes and thus is bound to continue to do so for the purposes of this cost recovery action under 42 U.S.C. § 9607.

B&M's reliance on these select portions of the Federal Facility Agreement is misplaced. First, the Federal Facility Agreement states that the definitions apply to "terms used in [the] Agreement," not that they apply to terms used in CERCLA. FFA at 15. Thus, the Federal Facility

Agreement does not purport to, nor could it, re-define terms that are defined by CERCLA for any purpose other than for the administration of the agreement.

Moreover, the Federal Facility Agreement provides that

> [n]othing in this Agreement shall constitute or be construed as a release from any claim, cause of action or demand in law or equity against any . . . corporation not a signatory to this Agreement for any liability it may have arising out of or relating to the . . . release or disposal of any Hazardous Substances . . . found at . . . the Site.

Id. at 73. Similarly, the Federal Facility Agreement specifies that "[n]othing in the agreement shall alter the Army's authority with respect to Removal Actions conducted pursuant to CERCLA § 104, 42 U.S.C. § 9604," id. at 50, including the recovery of the costs of such actions, id. at 87. Thus, the Federal Facility Agreement cannot be given the effect of releasing from liability a party that otherwise would be liable for response costs under 42 U.S.C. § 9607(a), although B&M's proposed usage of the Federal Facility Agreement would do so.

B&M further asserts that it is entirely consistent with and indeed desirable under CERCLA to define the "facility" broadly. Cases addressing the issue, however, suggest otherwise. See, e.g., United States v. Twp. of Brighton, 153 F.3d 307, 313 (6th Cir. 1998) ("[T]he bounds of a facility should be defined at least in part by the bounds of the contamination" unless the "area cannot be reasonably or naturally divided into multiple parts or functional units."). Moreover, courts that define the scope of a CERCLA facility broadly usually do so in order to properly align responsibility for the hazardous waste. See, e.g., Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc., 191 F.3d 409, 419 (4th Cir. 1999) ("[W]here, as here, the only arguments in favor of designating multiple facilities are weak in themselves and merely represent thinly-veiled attempts by a party to avoid responsibility for contamination, designation of the property as a single facility is appropriate."); Akzo Coatings, Inc. v. Aigner Corp., 960 F.

Supp. 1354, 1359 (N.D. Ind. 2006) (declining to subdivide site into five separate facilities where doing so would make it more difficult for the party seeking costs to recover), vacated on other grounds, sub. nom., Azko Nobel Coatings, Inc. v. Aigner Corp., 197 F.3d 302 (7th Cir. 1999).

Moreover, whereas it may be difficult to fairly subdivide some purportedly "large" facilities into subparts, the boundaries of both the Roundhouse Site and Plow Shop Pond are clear and undisputed and thus provide a reasonable and natural basis for delineating those portions as separate from the remainder of Fort Devens. See Union Carbide Corp. v. Thiokol Corp., 890 F. Supp. 1035, 1043 (S.D. Ga. 1994) (finding Solid Waste Management Units were separate facilities from a landfill in part because they were "geographically distinct from the landfill").

Finally, if "facility" for the purposes of this litigation were defined as Fort Devens, the government would not be able to pursue a cost recovery action against any entity that formerly owned a portion of the 9,000-acre site. A potentially responsible party may include "the owner and operator of a vessel or a facility" or "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of," among other parties. 42 U.S.C. § 9607(a)(1), (2). No party other than the Army ever has been "the owner" of all of Fort Devens. B&M's argument thus would preclude an action against any former owner or operator of a portion of Fort Devens. Such an outcome clearly would defeat "CERCLA's essential purpose" of "making those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created" and therefore is inappropriate. See American Cyanamid Co. v. Capuano, 381 F.3d 6, 15 (1st Cir. 2004) (quoting Boyd v. Boston Gas Co., 922 F.2d 401, 405 (1st Cir. 1993)) (internal quotation marks omitted).

Accordingly, because the Roundhouse Site and Plow Shop Pond satisfy CERCLA's definition of facility and can be and have been considered separately from the rest of Fort Devens for the purposes of this cleanup, it is reasonable and consistent with CERCLA to define them as separate facilities within Fort Devens for the purposes of this action.

3.  *Was the Cleanup of the Roundhouse Site and Plow Shop Pond a "Removal Action" under CERCLA?*

B&M next argues that the cleanup of the Roundhouse Site and Plow Shop Pond was not a removal action but a remedial action and that the statute of limitations for the cost recovery action therefore is found in 42 U.S.C § 9613(g)(2)(B). The United States argues that response actions performed at both the Roundhouse Site and Plow Shop Pond were removal actions and the relevant statute of limitations is found in 42 U.S.C. § 9613(g)(2)(A).

CERCLA provides the President with authority, whenever a hazardous substance is released, or there is a substantial threat of a release, in the environment "to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource)." 42 U.S.C. § 9604(a)(1). When the President is so

> authorized to act[,] . . . or . . . has reason to believe that a release has occurred or is about to occur, . . . he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate . . . In addition, the President may undertake . . . investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

Id. § 9604(b)(1). "The President shall select remedial actions to carry out this section in accordance with [42 U.S.C. § 9621]." Id. § 9604(c)(4); see also id. § 9621 (setting forth general rules for selecting remedial actions). The NCP prescribes factors to be considered in determining whether a removal action is appropriate. See 40 C.F.R. § 300.415.

Although the President was authorized to select the action to be taken here, the court determines *de novo* whether the actions the United States took fall within the statutory definition for a removal. New York v. Next Millenium Realty, LLC, 732 F.3d 117, 126 (2d Cir. 2013) ("Whether a suit to recover response costs under section 107 of CERCLA is a 'removal action' or a 'remedial action' is a question of law that we review *de novo*."); United States v. W.R. Grace & Co., 429 F.3d 1224, 1236 (9th Cir. 2005) ("Despite the EPA insistence that arbitrary and capricious review applies to all aspects of our inquiry, the statute does not support this reading. . . . Here we address not the EPA's selection of its remedy, but rather whether the actions taken fall within the statutory definition of a removal."); see Order 2-3 [#72] (whether a cleanup activity is characterized as a removal action or as a remedial action is a question of law and will be reviewed *de novo*).[3]

CERCLA defines "remove" or "removal" to include "the cleanup or removal of released hazardous substances from the environment." 42 U.S.C. § 9601(23). The NCP states further that "[e]xcavation, consolidation, or removal of highly contaminated soils from drainage or other

---

[3] The United States contends that the Army and the EPA chose the response actions by following the procedures outlined in the NCP for selecting removal actions and that the chosen response action was removal, rather than remediation. See Pl.'s Mot. Summ. J. Ex 8 at 8-9 [#81-8] (1999 Action Memoranda reviewing the factors set forth in 40 C.F.R. 300.415); Ex. 20 at 14-15 [#81-20] (2012 Action Memorandum doing same). The United States' further position—that the nature of the procedure used to select the response action determines whether the action is removal or remedial—is not supported by CERCLA's text. The statute defines "removal" and "remedial" by the purposes those actions serve, not the procedures used to select them. Nor is the proposition that courts determining how to characterize that action for a cost recovery action should consider the procedure the government followed in selecting a response action supported by the cases cited by the United States. Instead, these cases confront the question of whether the action selected was "consistent with the NCP" and not whether the court should characterize the action as removal or remedial. See, e.g., United States v. Chapman, 146 F.3d 1166, 1170-73 (9th Cir. 1998) (where the government made a prima facie showing that its response action was consistent with the NCP, costs were recoverable because defendant did not demonstrate that the government's actions were arbitrary and capricious); E.P.A. by & through U.S. v. TMG Enterprises, Inc., 979 F. Supp. 1110, 1120 (W.D. Ky. 1997) (defendants claimed that EPA's responses costs were "not recoverable because the EPA's actions were inconsistent with the [NCP]").

areas—where such actions will reduce the spread of, or direct contact with, the contamination" are, "as a general rule," "appropriate" removal actions. 40 C.F.R. § 300.415(e)(6). Significant work performed at the Roundhouse Site included, from 1999 to 2000, the excavation of 2,400 cubic yards of soil from the Roundhouse Site, including approximately 494 tons of lead-contaminated soil, Def.'s Mot. Summ. J. Ex. 21 at 28, 33 [#83-21], and, from 2012 to 2013, the excavation and disposal of sediment adjacent to the Roundhouse Site, including all visible "maintenance by-product deposits" that extended as an apron of material into the pond by about ten to forty feet, Pl.'s Mot. Summ. J. Ex. 20 at 20 [#81-20]. This work falls squarely within the statutory and regulatory definition for a removal action. See also United States v. Lowe, 118 F.3d 399, 403 (5th Cir. 1997) ("The term removal is aimed at containing and cleaning up hazardous substance releases.").

B&M contends, however, that the work done at the Roundhouse Site and Plow Shop Pond may not be categorized as removal because the work was neither urgent nor short-term. Specifically, B&M argues that the excavations at both sites had no "immediacy," "exigency," or "urgency" because the United States had some indication of the contamination at both the Roundhouse Site and Plow Shop Pond as early as 1993 but did not begin excavating the sites until 1999 and 2012 respectively. Def.'s Mem. Supp. Mot. Summ. J. 21 [#83]. B&M also points to the fact that the Army prepared a draft "No Further Action" report for the Roundhouse Site in 2002 and then put this document on the "back burner" for several years as proof that the government did not treat the situation with any urgency. See Simeone Dep. in Def.'s Mot. Summ. J. Ex. 13 at 23 [#83-13]. B&M concludes that, in light of the apparent lack of urgency or immediacy, the actions must be considered remedial actions rather than removal actions.

B&M argues that the promptness and short duration of an action determines whether it may be considered a removal action. A number of cases, in contrasting removal from remedial actions, offer some support for this position. See, e.g., Lowe, 118 F.3d at 402 ("A 'removal' is generally understood to be a short-term response and a 'remedial action' is generally considered a long-term response or permanent solution.") (citing 42 U.S.C. § 9601(23) & (24)); see also Exxon Corp. v. Hunt, 475 U.S. 355, 360 (1986) ("Governmental response consists of 'removal' or short term cleanup, [42 U.S.C.] § 9601(23), and 'remedial action,' or measures to achieve a 'permanent remedy' to a particular hazardous waste problem, § 9601(24)."); Pub. Serv. Co. of Colo. v. Gates Rubber Co., 175 F.3d 1177, 1182 (10th Cir. 1999) ("Generally, a removal action costs less, takes less time, and is geared to address an immediate release or threat of release. In broad contrast, a remedial action seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health." (internal citations omitted)).

Such generalities, however, obscure a central difference in the statutory definitions of the two types of actions. A primary thrust of a removal action is to *remove* the hazardous substances that already have been released into the environment and that pose a present threat to public health and safety. N.Y. State Elec. & Gas Corp. v. Firstenergy Corp., 766 F.3d 212, 230-31 (2d Cir. 2014) ("Removal actions are generally clean[]up measures taken in response to immediate threats to public health and safety . . . [and] are also generally designed to address contamination at its endpoint.") (citing, *inter alia*, 42 U.S.C. § 9601(23)). In contrast, although a remedial action may include cleanup of released hazardous substances, it "expressly focuses on actions necessary to 'prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.'" Lowe, 118 F.3d at 403 (quoting 42 U.S.C. § 9601(24)).

And while courts broadly have contrasted removal actions as "short-term" while remedial actions are "consistent with a permanent remedy," a removal action that removes hazardous substances from the environment may very well provide a long-term solution. See W.R. Grace, 429 F.3d at 1244-45 (finding the observation that "removal actions are often permanent solutions" "logical" and reasoning that it would not "make economic or practical sense to impose a requirement that removal actions must be only temporary in nature"); 40 C.F.R. § 300.415(g) (implying that a remedial action may not be necessary where a removal action "fully address[es] the threat"). Accordingly, the court understands remedial actions to be focused on preventing migration of substances that could cause substantial damage in the more distant future, whereas removal actions are focused on "cleanup and removal" to remove hazardous substances where a release already has occurred or is threatened to occur immediately.

This distinction does not lead to the conclusion suggested by B&M that, where the government fails to act quickly, the action is not a removal action. Instead, CERCLA explicitly contemplates that a removal action could occur after some delay. The statute specifically provides that, "[i]f the President selects a remedial action that results in any hazardous substances, pollutants, or contaminants remaining at the site, the President shall review [the] remedial action no less often than each 5 years after the initiation of such remedial action," and if, upon such review, it is the President's judgment "that action is appropriate[,] . . . the President shall take or require such action." 42 U.S.C. § 9621(c). Thus, a removal action could occur well after hazardous substances first are discovered.

Indeed, the argument that a response action that takes several months or years to implement cannot be a removal action is similar to the argument rejected by the First Circuit in United States v. JG-24, Inc., 478 F.3d 28 (1st Cir. 2007). In JG-24, the government sought to

recover costs of the cleanup of a fiberglass manufacturing facility even though it had taken the government more than twenty-one months to start it. Id. at 30-31, 32. The appellants argued that the cleanup was consistent with the NCP because it was not undertaken "as soon as possible," as the NCP required. Id. at 31-32. The First Circuit agreed with the appellants that, where the government determined that there was some "imminent risk," "one would expect a reasonably expeditious execution of the cleanup plan." Id. at 33. However, the court rejected the proposition that a cleanup that took many months to initiate could not be a removal action consistent with the NCP. Id. Instead, the court observed that the record described the site as littered with contaminates and that the EPA had made all the necessary factual determinations for its characterization of the cleanup as a removal action. Id.

Likewise, here, the court cannot conclude that the six years that it took the United States to develop and begin implementing a strategy to address the hazardous substances at the Roundhouse Site necessarily means that the action was not a removal action or that the threat posed by the hazards was not urgent. Indeed, the government's 30(b)(6) deponent testified that 54 separate Areas of Contamination initially were designated at Fort Devens and others were added; approximately 324 areas were investigated for contamination; and "upwards of 100" response actions have been taken throughout Fort Devens. Simeone Dep. in Defs.' Mot. Summ. J. Ex. 13 at 13 [#83-13]. Therefore, it may very well be that six years between discovering contamination and removing it from the Roundhouse Site was the government acting "as soon as possible" under these circumstances. In any event, it does not determine that the action taken to remove them was not a removal action.

A review of the record demonstrates that the response action falls within the statutory definition of a removal. Namely, the 1999 Action Memorandum indicates that the excavation

and disposal of soils containing COPCs at the site was designed to "mitigate the potential threat to human health, welfare, and/or the environment identified at the Maintenance By-Product Area," and not to mitigate the threat posed by the migration of the contaminated soils to some other location where they might cause substantial danger. Defs.' Mot. Summ. J. Ex. 27 at 12 [#83-12]. Indeed, the 1999 Action Memorandum notes that groundwater sampling had identified no COPCs in the groundwater sources, and, therefore, "there [was] no evidence of vertical migration" of contaminants via groundwater. Id. at 10. Though the 1999 Action Memorandum did note that the steep slope of the land in the vicinity of the Maintenance By-Products Area could result in the migration of surface soils during heavy precipitation and that the removal of the contaminated soils would eliminate the source of such migrations, id. at 9, the memorandum does not suggest that the removal action was selected in order to prevent or minimize the risk of further migrations or that such migrations would cause "substantial damage." In other words, though the COPCs could have posed risks if they migrated, the findings in the Site Investigations and Action Memorandum support the conclusion that the presence of the contaminants posed risks at the Roundhouse Site itself and that the excavation of soils was selected to minimize the risks posed at the site.

Finally, despite B&M's arguments to the contrary, the 1999 Action Memorandum's expectation that the proposed removal activities would "provide a long-term solution for soil at the site," id. at 12, and the government's 30(b)(6) deponent's statement that putting soil and grass on top was viewed as "permanent remedy," Simeone Dep. in Defs.' Mot. Summ. J. Ex. 13 at 18 [#83-13], do not necessarily make the response action a remedial one. Indeed, as noted above, it is entirely logical and indeed efficient for a removal action to address an immediate and present threat in such a way that fully addresses the threat. See W.R. Grace, 429 F.3d at 1244-45;

Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415, 1419 n. 4 (8th Cir. 1990)

(rejecting the contention that "an excavation that totally and permanently cleans up a hazardous

waste site never can be classified as a removal action"), abrogated on other grounds by Key

Tronic Corp. v. United States, 511 U.S. 809 (1994). Thus, backfilling the excavated land with

topsoil and planting grass seeds in order to prevent erosion of the unexcavated soil do not make

the Roundhouse Site cleanup a remedial action. Cf. United States v. R.A. Corbett Transp., 785 F.

Supp. 81, 82 (E.D. Tex. 1990) (holding that excavation followed by backfilling with clean soil

and capping with clay cover to prevent erosion were all part of a single removal action).

Accordingly, because the response action at the Roundhouse Site was implemented to

remove the hazardous substances and thereby mitigate the threats posed by the contaminants *at

that site*, it is properly characterized as a removal action.

### 4.   Is the Cost Recovery Action Time-Barred?

An initial action for the recovery of costs for a removal action must be commenced

"within 3 years after completion of the removal action." 42 U.S.C. § 9613(g)(2)(A). A removal

action includes all related activities—*i.e.*, physical removal as well as evaluation and monitoring.

See Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 840-44 (6th Cir. 1994) (a "removal

action" includes all of the individual tasks in a cleanup, such as testing and physical removal of

hazardous materials, and cannot be broken down into individual tasks for statute-of-limitations

purposes); California v. Hyampom Lumber Co., 903 F. Supp. 1389, 1394 (E.D. Cal. 1995)

("[A]ll 'removal' activities at a site constitute a single 'removal' for statute of limitations

purposes."); United States v. Davis, 882 F. Supp. 1217, 1226 (D.R.I. 1995) ("[T]o decide that a

removal action is over when the physical removal is over but before the process of monitoring,

assessing and evaluating the damage has come to completion violates the clear sense of the statutory language.").

Because a removal action may be conducted in several stages and may involve several different types of activities, courts look to certain events, such as the completion of a Remedial Investigation/Feasibility Study, issuance of Record of Decision ("ROD"), or some other determination that no further action is necessary, to mark the completion of the entire removal action. See, e.g., United States v. Rohm & Haas Co., Civ. No. 09-5528 (FLW), 2010 WL 3811302, at *4 (D.N.J. Sept. 22, 2010) ("This limitation period begins to accrue upon issuance of an ROD." (citing Davis, 882 F. Supp. at 1226)); United States v. Chromatex, Inc., 832 F. Supp. 900, 902 (M.D. Pa. 1993) (completion of removal action was triggered by a "final pollution report" determining that no further action was required based upon earlier photographs and inspections), aff'd, 39 F.3d 1171 (3d Cir. 1994); United States v. United Nuclear Corp., 814 F. Supp. 1552, 1562-63 (D.N.M. 1992) (cost recovery action for removal costs brought exactly three years after issuance of ROD was timely). Consistent with these authorities, the United States argues that the statute of limitations did not begin to run until September 2015, when the Army issued the ROD here. See Filing R. Decision Ex. 1 at 30-31 [#95-1].

B&M argues that adopting the government's position—that the statute of limitations does not run until the government issues a Record of Decision—unreasonably would result in the government having absolute control over the timeliness of its cost recovery actions. B&M relies on Schaefer v. Town of Victor, 457 F.3d 188 (2d Cir. 2006), where the Second Circuit held that the statute of limitations for a remedial action was measured from the time physical construction actually began, not from the time that the plaintiff said it began. Id. at 209. In so holding, the Second Circuit rejected the Ninth Circuit's reasoning in California Department of Toxic

Substances Control v. Neville Chemical Co., 358 F.3d 661, 667 (9th Cir. 2004), which held that the statute of limitations for remedial actions did not begin to run until a "remedial action plan" was adopted by the government. Schaefer, 457 F.3d at 205, 209. The Second Circuit declined to construe the statute as the Ninth Circuit had, because it concluded that doing so "would give government entities almost unlimited discretion as to when, or even whether, the limitations period begins to run." Id. at 209. B&M cautions that construing the removal actions statute of limitations to require that a formal decision document be issued before an action can be considered "complete" similarly would afford the government too much discretion over when the statute of limitations begins to run.

Schaefer and Neville both address the statute of limitations for remedial actions, rather than the statute of limitations for removal actions. The statute of limitations for remedial actions is triggered by "physical on-site construction," not by measures such as testing, monitoring, or designing a remedy, or otherwise evaluating the site. United States v. Findett Corp., 220 F.3d 842, 848 (8th Cir. 2000). In contrast, removal actions include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," 42 U.S.C. § 9601(23), and the statute of limitations is triggered by "completion of the removal action," id. § 9613(g)(2)(A). By definition, a removal action is not complete while the EPA's evaluations are ongoing.

Nor may the court import a limitation not present in the statute. Section 9613(g)(2) provides that "an action may be commenced under section 9607 of this title for recovery of costs *at any time after such costs have been incurred*" except as otherwise provided in that paragraph. (Emphasis added). Subparagraph (A) of that section provides that an initial action for the recovery of costs for a removal action must be commenced "within 3 years after completion of

the removal action." 42 U.S.C. § 9613(g)(2)(A). CERCLA does not require the government to bring an action prematurely, while cleanup efforts are ongoing.

Notably, in confirming that district courts do not have jurisdiction for statutory claims filed before the government brings an enforcement action, the First Circuit has emphasized that many goals under CERCLA were served by avoiding piecemeal litigation. Reardon v. United States, 947 F.2d 1509, 1513 (1st Cir. 1991). At the same time, the court upheld a due process challenge to the filing of a lien under CERCLA, recognizing that the property owner may not receive an immediate post-deprivation hearing under the statutory scheme, because the owner would receive no hearing until a cost recovery action was brought by the government and that the timing of that was entirely within the government's control under 42 U.S.C. § 9613(g)(2),

> which gives EPA three years after a removal action is completed or six years after a remedial action is commenced to bring such a suit. *The running of the statute of limitations is entirely within EPA's control*. Since the government may take its own sweet time before suing, and since the removal or remedial action may itself take years to complete, the lien may be in place for a considerable time without an opportunity for a hearing.

Reardon, 947 F.2d at 1519 (emphasis added). The First Circuit did not suggest that it could imply some limitation to avoid the government's control over the running of the statute of limitations. Instead, it concluded that imposition of a lien without a hearing violated due process. Id. at 1520.

B&M argues that, to the extent Reardon's dicta that "the running of the statute of limitations is entirely within EPA's control" is applicable to any other set of facts, it does not apply to "federal facilities," because, two years later, Congress amended CERCLA to recommend that "[r]emedial actions . . . and corrective actions at . . . Federal facilities should be expedited in a manner to facilitate environmental protection and the sale or transfer of such excess real property." See Community Environmental Response Facilitation Act, Pub. L. No.

102-426, § 2, 106 Stat. 2174 (1996) (codified at 42 U.S.C. § 9620). Similarly, B&M points out that the First Circuit more recently remarked that the government has an "obligation to avoid drawn-out litigation," in further support of the position that the government may not in fact take as much time as it deems necessary to complete a removal action. See Gen. Elec. Co., 670 F.3d at 394. However, neither development changed the text of the statute of limitations nor obligated the government to bring cost recovery actions promptly such that the government's failure to do so would bar a cost recovery action.

B&M makes the further related argument that, when the government "unnecessarily delays" in issuing an ROD, the removal action should be deemed complete at some earlier time. Specifically, B&M argues that the removal action in this case should be considered complete when the physical excavation of the Roundhouse Site ended in 2000, because the government unnecessarily delayed issuing the ROD until 2015. In support of this argument, B&M relies primarily on the conclusion by a district court in the Western District of Arkansas in United States v. Allen, Civ. No. 90-2093, 1990 WL 339488, at *6 (W.D. Ark. Nov. 6, 1990), and cases that have quoted it. In Allen, the court held that, because the "[d]efendants ha[d] not alleged that the EPA unnecessarily delayed the disposal of the material or unnecessarily delayed in making the determination that no further on-site activity was needed," the statute of limitations began to run after the material was disposed of and the necessity of further activity was evaluated. Id. at *6. B&M argues from this statement that "courts insist that the government may not 'unnecessarily delay' issuing the decision document, as that would destroy the time-bar." Defs.' Mem. Supp. Mot. Summ. J. 19-20 [#83] (internal brackets omitted). However, B&M cites no case in which a court has held that the government's "unnecessary delay" actually impacted the running of the statute of limitations, and, in fact, the cases that have made passing reference to

the concept of "unnecessary delay" (quoting <u>Allen</u>, 1990 WL 339488, at *6) have not expanded

on what would constitute such a delay or what the effect of such a delay would be. Indeed, those

cases concluded that the statute of limitations had not run until all monitoring, evaluating, and

assessing was completed or a determination that no further action was necessary was made. <u>See</u>

<u>United States v. City of Aberdeen</u>, 929 F. Supp. 989, 991-92 (N.D. Miss. 1996) (action brought

within three years of government's last evaluation was done was timely); <u>Davis</u>, 882 F. Supp. at

1225-26 (action brought exactly three years from issuance of ROD was timely notwithstanding

that the last physical removal of waste occurred more than four years before the action was

filed).

Moreover, even if delay could cause the statute of limitations to begin to run before an

ROD was issued, there is ample evidence to support the conclusion that the time the EPA took to

issue a ROD in this case was necessary, because a determination of whether further action was

required for the Roundhouse Site could not be made until Plow Shop Pond was studied and

addressed. B&M points to no contrary facts from which the court could conclude that this delay

was not necessary.

The overwhelming majority of cases addressing the issue find a removal action to be

complete when final monitoring or evaluation is done, a ROD is issued, or some determination is

reached that no further action is necessary. <u>See</u> <u>United States v. Cantrell</u>, 92 F. Supp. 2d 704, 716

(S.D. Ohio 2000) (complaint filed three years after final inspection of site where removal action

was conducted was timely); <u>Pneumo Abex Corp. v. Bessemer & Lake Erie R.R. Co., Inc.</u>, 936 F.

Supp. 1250, 1261 (E.D. Va. 1996) ("Several district courts have held that the statute of

limitations does not begin to run until the EPA issues the ROD."); <u>Davis</u>, 882 F. Supp. at 1226

(courts have "overwhelmingly concluded that the removal process does not end until the

completion of the [Remedial Investigation/Feasibility Study] and the issuance of the Record of

Decision"); United States v. Petersen Sand & Gravel, Inc., 824 F. Supp. 751, 755 (N.D. Ill. 1991)

("[T]he statute of limitations begins running when the remedial investigation and feasibility

study removal action are completed by the EPA's issuance of its record of decision."); Allen,

1990 WL 339488, at *6 (action was brought within three years of government determining that

no further action was necessary was not time-barred). These cases reason that all physical

removal and site evaluations, including those necessary to prepare an ROD constitute a single

"removal action" under CERCLA, and that the entire removal action is not complete until the

last of these efforts is done.

   In many of those cases, all of the evaluation and physical removal activities were

completed within a few years and were conducted with some regular frequency during that

relatively shorter period of time. See, e.g., City of Aberdeen, 929 F. Supp. at 992 (entire removal

action occurred in several stages over four years); Pneumo Abex Corp., 936 F. Supp. at 1261

(noting that, although the "[p]laintiffs ha[d] been engaged in [the] cleanup for some time," their

efforts were "continuous" and that, as a result, the action was not time-barred). Here, by contrast,

there is no evidence that the Army regularly was monitoring or evaluating the Roundhouse Site

between 2002 (when it issued the draft "no further action" decision document) and 2014 (when it

issued the Update Risk Characterization for the Roundhouse Site). Nonetheless, under these

circumstances—namely, that the Army was evaluating and developing a plan for the cleanup of

Plow Shop Pond and the EPA had directed the Army to complete that cleanup before concluding

that no further action was necessary for the Roundhouse Site—the lack of more frequent

evaluations of the Roundhouse Site after the sizable physical excavation of the contaminated soil

makes sense. Moreover, "[n]othing in CERCLA requires that EPA expedite its activities for the

benefit of potential defendants in recovery actions." <u>See</u> <u>Chromatex</u>, 832 F. Supp. at 902. Therefore, despite the considerable length of time the government took to complete the removal action, neither the statute nor the case law suggest that those distinguishing facts are material to when the statute of limitations began to run.

The court finds that the statute of limitations here did not begin to run until the Army issued the ROD for the Roundhouse Site in September 2015, finally determining that limited action in the form of land use restrictions be implemented.

III.   <u>Conclusion</u>

For the reasons set forth above, the United States' <u>Motion for Partial Summary Judgment on Boston and Maine Corporation's Statute of Limitations Defenses</u> [#80] is ALLOWED and B&M's <u>Motion for Summary Judgment</u> is DENIED [#82].

IT IS SO ORDERED.

Date: September 22, 2016                                     /s/ Indira Talwani
                                                            United States District Judge